# EXHIBIT "A"
# PART 5 OF 5

| Plaintiffs Complaint | Case: |
|---|---|

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and exact copy of the above has been furnished by U.S. Mail on this 13th day of June, 2011 to the following:

**COUNTRYWIDE HOME LOANS, INC.**
c/o Registered Agent: CT Corporation System
2394 E Camelback Road
Phoenix, Arizona 85016

**BAC HOME LOANS SERVICNG, LP**
c/o Registered Agent: CT Corporation System
2394 E Camelback Road
Phoenix, Arizona 85016

**BANK OF AMERICA, N.A.**
c/o Registered Agent: CT Corporation System
2394 E Camelback Road
Phoenix, Arizona 85016

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
c/o Registered Agent: Sharon Horstkamp
1818 Library Street, Suite 300
Reston, VA 20190

**RECONTRUST COMPANY, N.A.**
2380 Performance Dr. TX2-985-07-03
Richardson, TX 75082

Coree E Neumeyer, Esq.
Michael B Dvoren, Esq
c/o **BRYAN CAVE LLP**
One Renaissance Square
Two North Central Avenue, Ste 2200
Phoenix, AZ 85004-4406

/s/ Sharon J Sparlin

EXHIBIT 1

# FENNEMORE CRAIG, P.C.

One South Church Avenue, Suite 1000
Tucson, Arizona 85701-1627
(520) 879-6800

**Barney M. Holtzman**
Direct Phone: (520) 879-6810
Direct Fax: (520) 879-6892
bholtzman@fclaw.com

**Law Offices**
Phoenix  (602) 916-5000
Tucson   (520) 879-6800
Nogales  (520) 281-3480
Las Vegas (702) 692-8000
Denver   (303) 291-3200

April 18, 2011

Mr. Michael B. and Sharon J. Sparlin
9151 E. Showcase Lane
Tucson, AZ 85749

Re:   Universal American Mortgage Co.

Dear Mr. and Mrs. Sparlin:

We received your April 11, 2011 letter and enclosed "Release of Mortgage" forms you provided. Universal American Mortgage Company ("UAMC") will **not** sign the forms. UAMC has no knowledge of whether the mortgages and debts have been fully paid, satisfied, released and discharged. Moreover, UAMC is not the holder of the mortgage or debt and, therefore, cannot release them.

Very truly yours,

FENNEMORE CRAIG, P.C.

*Barney Holtzman / ARP*

Barney M. Holtzman

BMH/arp

5255307

EXHIBIT 2

PLEASE SEE "RISK FACTORS" IN THE PROSPECTUS FOR A DESCRIPTION OF INFORMATION THAT SHOULD BE CONSIDERED IN CONNECTION WITH AN INVESTMENT IN THE OFFERED CERTIFICATES.

Summary of Terms



```
F. ANN RODRIGUEZ, RECORDER          DOCKET:          13772
RECORDED BY: LAM                    PAGE:              622
          DEPUTY RECORDER           NO. OF PAGES:        2
          6545    EAST-2            SEQUENCE:    20100560184
W                                                 03/24/2010
MICHAEL BENSON SPARLIN              QCDEED              14:32
9151 E SHOWCASE LN
TUCSON AZ  85749                    MAIL
                                    AMOUNT PAID  $    10.00
```

# QUITCLAIM DEED  A-7         EXHIBIT 4

TRA:  N/A                            APN: 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

____ This transfer is exempt from the documentary transfer tax.
____ The documentary transfer tax is $ __-0-__ and I computed on:
  _X_ The full value of the interest or property conveyed.
  ____ The full value less the liens or encumbrances remaining
       thereon at the time of sale.
The property is located in ____ an unincorporated area
                           _X_ the city of TUCSON.
This is a bona fide gift and the Grantor(s) received nothing in return, R&T
Gift: 11-911

## NOTICE OF CHANGE RE:

**GRANTOR(S)/TRUSTOR(S):** MICHAEL BENSON SPARLIN & SHARON JEANETTE SPARLIN
9151 E. Showcase Lane, Tucson, AZ  85749

FOR VALUE CONSIDERATION, receipt of which is hereby acknowledged: Michael Benson Sparlin and Sharon Jeanette Sparlin, husband and wife, do hereby REMISE, RELEASE, GRANT, AND FOREVER QUITCLAIM to:

**GRANTEE:** 7922 S. CLARKSON COURT TRUST, a Private Contract Trust
9151 E. Showcase Lane, Tucson, Arizona 85749

the real property in the City of TUCSON, County of PIMA, State of ARIZONA, described as:
Lot 133 of VISTA MONTANA ESTRATES PHASE ONE, according to the map or plat thereof of record in the office of the county recorder, Pima County, Arizona, in book 58 of maps and plats at page 96 thereof and as amended by declaration of scrivener's error recorded in Docket 12773 at page 5485. Commonly known as: 7922 S. CLARKSON COURT, TUCSON, ARIZONA state.

See also Exhibit "A" attached hereto, as this QUITCLAIM DEED evidences the sole purpose of Notice of Change in Trustee and Beneficiary appointments ONLY. Dated  3/24/10

_____          _____
Michael Benson Sparlin                    Sharon Jeanette Sparlin

State of ARIZONA       )
County of PIMA         )
Subscribed and sworn to (or affirmed) before me on this 24th day of March, 2010, by Michael Benson Sparlin and Sharon Jeanette Sparlin, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____          (SEAL)
Notary Public
                                         OFFICIAL SEAL
                                         BARBARA K. DORR
                                         Notary Public - State of Arizona
                                         PIMA COUNTY

## ATTACHMENT/EXHIBIT "A"

**Original Deed of Trust Record: Docket 12966, Page 3332, Sequence 20070050717
Dated January 8, 2007**

**GRANTOR(S)/TRUSTOR(S):** MICHAEL BENSON SPARLIN and SHARON JEANETTE SPARLIN
**Original Loan** #8591661 and **Service** #148036422 **APN:** 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

1. **Effective Immediately**, the undersigned Michael Benson Sparlin and Sharon Jeanette Sparlin forever removes/releases/discharges all: "Trustee(s), Successor Trustee(s), Substituted Trustee, Agent(s), Servicer(s), Assign(s), Transfer(s), known and unknown", including UNIVERSAL AMERICAN MORTGAGE COMPANY of 1725 W. GREEN TRADE DRIVE, SUITE 104, TEMPE, AZ 8528, COUNTRYWIDE, P.O. BOX 60875, LOS ANGELES, CA 90060-0875 and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., 1595 SPRING HILL ROAD, SUITE 310, VIENNA, VIRGINIA 22182; existing under the laws of ARIZONA; and, Thereby removing and terminating the same from any/all duties and forever barring/stopping the aforesaid from any further appointments or assignments originally granted or contained within the Deeds of Trusts concerned herein.

2. **Effective Immediately**, the undersigned Michael Benson Sparlin and Sharon Jeanette Sparlin forever Revokes/Cancels/Voids/Rescinds any/all duties, appointments, or assignments originally granted by Revocation of Power of Attorney, Authority, or otherwise granted/granting, and/or signs/signatures, assigned/assigning to any party(ies) including the alleged lender and successors, known and unknown including but not limited to: UNIVERSAL AMERICAN MORTGAGE COMPANY, COUNTRYWIDE and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. addresses named above; Thereby removing and terminating the same from any/all duties and forever barring/stopping the aforesaid of any further appointments of any/all "TRUSTEE(S)", "SUCCESSOR TRUSTEE(S)", "SUBSTITUTES", or "BENEFICIARY(S)".

## LET IT BE KNOWN

All above named "Trustee(s), Successor Trustee(s), Beneficiary(s)", or Assigns, Substitutes, known or unknown in clauses 1 and 2 above, are hereby directed to immediately **CEASE** and **DESIST** any further actions through said appointments/assignments granted in or from Record Docket 12966, Page 3332, Sequence 20070050717, dated January 8, 2007. **ANY** such continued or further action by ANY of the above names parties may result in legal actions against them.

Be it further known, GRANTOR(S)/TRUSTOR(S): MICHAEL BENSON SPARLIN and SHARON JEANETTE SPARLIN do hereby QUITCLAIM all aforementioned duty(s) and benefit(s) of "Trustee" and "Beneficiary" regarding original Deed of Trust No. Docket 12966, Page 3332, Sequence 20070050717, to: Richard Towne (Trustee) of the "7922 S. CLARKSON COURT TRUST, a PRIVATE CONTRACT TRUST". Dated: 3/24/10

_____    _____
Michael Benson Sparlin                          Sharon Jeanette Sparlin

EXHIBIT 5

# naked capitalism

[ Subscribe | Blogroll | Topics | Archives | Videos | Contributors | Site Statistics | Search ]



Trade Free for 60 Days at E*TRADE Securities

## Recent Items

- Links 5/11/11 - 05/11/2011 - Yves Smith
- FDIC Filed Suit Against Lender Processing Services for $154 Million - 05/11/2011 - Yves Smith
- On Dubious Defenses of the FDIC's Lehman Resolution Plan - 05/11/2011 - Yves Smith
- Guest Post: Interrogation Experts From Every Branch of the Military and Intelligence Agree that Torture DOESN'T Produce Useful Information - 05/11/2011 - George Washington
- Quelle Surprise! 50 State Attorneys General Settlement Talks Beating a Retreat - 05/10/2011 - Yves Smith

## Sunday, November 21, 2010

### Countrywide Admits to Not Conveying Notes to Mortgage Securitization Trusts

Testimony in a New Jersey bankruptcy court case provides proof of the scenario we've depicted on this blog since September, namely, that subprime originators, starting sometime in the 2004-2005 timeframe, if not earlier, stopped conveying note (the borrower IOU) to mortgage securitization trust as stipulated in the pooling and servicing agreement. Professor Adam Levitin in his testimony before the House Financial Services Committee last week described what the implications would be:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever. The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law. If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts, which would cloud title to nearly every property in the United States and would create contract rescission/putback liabilities in the trillions of dollars, greatly exceeding the capital of the US's major financial institutions....
>
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose...
>
> If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors' purchased were in fact non-mortgage-backed securities. In such a case,



mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors, and that the securitization sponsor would have to have risk-weighted capital for the mortgages. If this problem exists on a wide-scale, there is not the capital in the financial system to pay for the rescission claims; the rescission claims would be in the trillions of dollars, making the major banking institutions in the United States would be insolvent.

As we indicated back in September, it appeared that Countrywide, and likely many other subprime originators quit conveying the notes to the securitization trusts sometime in the 2004-2005 time frame. Yet bizarrely, they did not change the pooling and servicing agreements to reflect what appears to be a change in industry practice. Our evidence of this change was strictly anecdotal; this bankruptcy court filing, posted at StopForeclosureFraud provides the first bit of concrete proof. The key section:

> As to the location of the note, Ms. DeMartini testified that to her
> knowledge, the original note never left the possession of Countrywide, and that
> the original note appears to have been transferred to Countrywide's foreclosure
> unit, as evidenced by internal FedEx tracking numbers. She also confirmed
> that the new allonge had not been attached or otherwise affIXed to the note.
> She testified further that it was customary for Countrywide to maintain possession of
> the original note and related loan documents.

This is significant for two reasons: first, it points to pattern and practice, and not a mere isolated lapse. Second, Countrywide, the largest subprime originator, reported in SEC filings that it securitized 96% of the loans it originated. So this activity cannot be defended by arguing that Countrywide retained notes because it was not on-selling them; the overwhelming majority of its mortgage notes clearly were intended to go to RMBS trusts, but it appears industry participants came to see it as too much bother to adhere to the commitments in their contracts.

As one hedge fund investor noted, "Whenever we've gotten into situations on the short side, no matter how bad we think it is, it always proven to be worse." The mortgage securitization mess looks to be adhering to this script.

**More on this topic** (What's this?)

Pay Off Your Mortgage Early or Invest Your Money? (Learn Mining News, 4/15/11)

Mortgage Down Payment and Private Mortgage Insurance (Learn Mining News, 2/13/11)

The New Housing Paradigm (Wealth Daily, 4/19/11)

  Read more on **Mortgage**, **Securitization** at **Wikinvest**

Topics: Banana republic, Banking industry, Credit markets, Legal, Real estate

Email This Post Posted by Yves Smith at 3:09 pm

59 Comments » Links to this post

BOOKMARK

# 59 Comments:

*Sufferin' Succotash* says:
November 21, 2010 at 3:43 pm

Deadbeats! Deadbeats!



JO MALONE

Page 1

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION - ATLANTIC COUNTY
DOCKET NO. F-10209-08

BANK OF NEW YORK AS TRUSTEE FOR       EXHIBIT 6
THE CERTIFICATE HOLDERS CWABS,
INC. ASSET-BACKED CERTIFICATES,
SERIES 2005-AB3
       Plaintiff(s),

  vs.

VICTOR and ENOABASI UKPE

       Defendant(s).

---

VICTOR and ENOABASI UKPE
       Counterclaimants and
       Third Party Plaintiffs,

  vs.

BANK OF NEW YORK AS TRUSTEE FOR
THE CERTIFICATE HOLDERS CWABS,
INC. ASSET-BACKED CERTIFICATES,
SERIES 2005-AB3
       Defendants on the Counterclaim,
  and
AMERICA'S WHOLESALE LENDER;
COUNTRYWIDE HOME LOANS, INC.;

MORGAN FUNDING CORPORATION,

ROBERT CHILDERS; COUNTRYWIDE

HOME LOANS SERVICING LP,

PHELAN, HALLINAN & SCHMIEG,

P.C.,

       Third Party Defendants

--------------------

April 7, 2010     William Hultman

DEGNAN & BATEMAN
(856) 232-7400

Page 61

1   particular resolution, this Corporate Resolution Hultman
2   Exhibit 4?
3     A   They originally met in April of 1998 and
4   delegated me the authority to do this, and so by virtue
5   of the fact that I had the delegated authority when I
6   appointed them officers on October 23, 2007, that was an
7   action of the Board.
8     Q   Your testimony, Mr. Hultman, is back in April
9   of 1998 the Board of a predecessor company authorized
10  you to appoint non-members of MERS as assistant
11  secretaries and vice-presidents of a successor
12  corporation?
13        MR. BROCHIN:  Excuse me.  Object to the form
14  of the question.
15    Q   Go ahead, please answer.
16    A   No.
17    Q   What did the Board do in April of 1998 in
18  terms of authorizing you to appoint anyone to do
19  anything?
20    A   What they authorized me to do was they
21  delegated me the authority to elect persons requested by
22  members to be officers of Mortgage Electronic
23  Registration Systems, Inc.
24    Q   What kind of officers?
25    A   Assistant secretary and vice-president.

Page 69

1    you a salaried employee of MERS?
2        A    No.
3        Q    Are you a salaried employee of MERS Corp,
4    Inc.?
5        A    Yes.
6        Q    Are any of the employees of MERS, Inc.
7    salaried employees?
8        A    I don't understand your question.
9        Q    Does anyone get a paycheck, if they are an
10   employee of MERS, Inc., do they get a paycheck from
11   Mercer, Inc.?
12       A    There is no MERS, Inc.
13       Q    I thought, sir, there's a company that was
14   formed January 1, 1999, Mortgage Electronic Registration
15   Systems, Inc.  Does it have paid employees?
16       A    No, it does not.
17       Q    Does it have employees?
18       A    No.
19       Q    Just so there's not any confusion, I have been
20   using MERS, but I thought we had an agreement earlier
21   today that would be a shorthand for Mortgage Electronic
22   Registration Systems, Inc.  Have you been confused?
23       A    I was confused because you said MERS, Inc.
24   There is no MERS, Inc.
25       Q    Thank you.  I will go back to just using MERS

Page 71

1  A   Of MERS.
2  Q   So you are the secretary of MERS, but are not
3  an employee of MERS?
4  A   That's correct.
5  Q   Does MERS have any policy for auditing the
6  activities of its officers; does MERS audit the activity
7  of its officers?
8  A   Well, there is a Board of directors who is
9  responsible for all the activities of the corporation.
10 Q   And my question to you was does MERS audit the
11 activities of its officers?
12 A   I don't understand your question.
13 Q   How many assistant secretaries have you
14 appointed pursuant to the April 9, 1998 resolution; how
15 many assistant secretaries of MERS have you appointed?
16 A   I don't know that number.
17 Q   Approximately?
18 A   I wouldn't even begin to be able to tell you
19 right now.
20 Q   Is it in the thousands?
21 A   Yes.
22 Q   Have you been doing this all around the
23 country in every state in the country?
24 A   Yes.
25 Q   And all these officers I understand are unpaid

```
 1            MR. BROCHIN:  Why are you asking him a
 2   question that calls for confidential information?
 3            MR. MALONE:  I just want to establish you're
 4   going to assert a privelege to it, that's all.
 5            MR. BROCHIN:  A privelege to a communication
 6   between a witnesses and his lawyer?
 7            MR. MALONE:  Well, were there other people
 8   present?
 9            MR. BROCHIN:  Isn't that a privelege?
10            MR. MALONE:  Were there other people present?
11   If you want to assert a privelege, please do so,
12   otherwise answer the question.
13            MR. BROCHIN:  That wasn't your question.  I
14   instruct the witness not to answer the question on
15   grounds it calls for atttorney/client privelege
16   communications.
17   BY MR. MALONE:
18       Q    On the attachment, the second page to Hultman
19   Exhibit 32, the Corporate Resolution, the form Corporate
20   Resolution, has five numbered paragraphs.  Do you see
21   those?
22       A    Yes.
23       Q    Do any of those numbered paragraphs authorize
24   the certifying officers to assign a promissory note?
25       A    No.
```

```
 1      Q     Has MERS to your knowledge ever authorized a
 2   certifying officer to assign a promissory note?
 3      A     I don't recall.
 4      Q     In paragraph two there is a reference to
 5   assigning the lien of any mortgage loan registered on
 6   the MERS system.  Do you see that?
 7      A     Yes.
 8      Q     And by lien are we talking about the security
 9   interest, the mortgage, that accompanies a promissory
10   note?
11      A     Yes.
12      Q     And when a mortgage is recorded on the MERS
13   system identifying MERS as the mortgagee as nominee for
14   its lender, what is the value of that mortgage in terms
15   of what MERS holds?
16            MR. BROCHIN:  Object to the form of the
17   question to the extent it characterizes MERS as being
18   recorded.  Go ahead.
19      A     I don't understand the question.
20      Q     When a mortgage is recorded with a county
21   clerk's office identifying MERS as the mortgagee, what
22   is the value of that mortgage to MERS?  Does it have a
23   value?
24      A     It's part of our process.
25      Q     I understand it's part of your process, but
```

Page 138

1   Q    And what you just described is the mortgage,
2   is that correct?
3   A    I'm describing the relationship to what MERS
4   does with respect to the entire transaction.
5   Q    So that answer, are you saying MERS has an
6   ownership interest in the promissory note?
7   A    I'm describing what our interest is in this
8   transaction.
9   Q    Let me break the question down then.  Does
10  MERS have an ownership interest in the promissory note
11  that the Ukpes signed?
12       MR. BROCHIN:  Object to the form of the
13  question.
14  A    If you mean ownership interest in the sense
15  that are we entitled to any of the proceeds of the
16  promissory note, the answer is no.
17  Q    And in describing any other kind of interest
18  you have in the promissory note, I think you were
19  answering that in your view MERS does have an interest
20  in the Ukpes' promissory note, is that correct?
21  A    What I'm saying is we have -- we are the
22  agents of the note holder holding title to the mortgage,
23  securing the repayment of the promissory note when the
24  borrower pledges the property to them.
25  Q    When you're saying the agent of the note